## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE  DIVISION

| | | |
|---|---|---|
| **AKIVA D. JONES,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 7:22CV00222 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **OFFICER N.Z. PERRIGAN, ET AL.,** | ) | JUDGE JAMES P. JONES |
| | ) | |
| Defendants. | ) | |
| | ) | |

*Akiva Desean Jones, Pro Se Plaintiff; Richard C. Vorhis, OFFICE OF THE ATTORNEY GENERAL, CRIMINAL JUSTICE AND PUBLIC SAFETY DIVISION, Richmond, Virginia, for defendants Perrigan, Salyers, Collins, Allen, and Phipps; Edward J. McNelis, III, SANDS ANDERSON, PC, Richmond, Virginia, for Defendants Trent and Jessee.*

Plaintiff Akiva Desean Jones, a Virginia inmate proceeding pro se, filed this civil rights action under 42 U.S.C. § 1983.  He alleges that correctional officers used excessive force against him, and that medical staff provided inadequate medical care for his broken nose.   Jones has filed a summary judgment motion against the defendants, relying on his Complaint, video footage of the incident, and other documentation.  Defendants Nurse Practitioner (NP) L. Jessee and Nurse D. Trent (collectively, the Medical Defendants) have filed an Answer, a brief in opposition to Jones' motion, and a summary judgment motion.  In support of their arguments, they submit affidavits from Trent, Jessee, Dr. Kevin Fox, and copies of Jones' medical

and mental health records from the relevant time period.  Defendants N.Z. Perrigan, P. Salyers, E. Collins, S. Allen, and J. A. Phipps, in opposition to Jones' summary judgment motion, have filed affidavits and other documentation, asserting that material disputes of fact remain at issue that cannot be resolved without a trial regarding the excessive force claims.  After review of the record, I conclude that the medical defendants are entitled to summary judgment, Jones' summary judgment motion must be denied, and the remaining claims must be set for trial against all remaining defendants.

## I. BACKGROUND.

Jones is in the custody of the Virginia Department of Corrections (VDOC) and at the time his claims arose, he was confined at Red Onion State Prison (Red Onion).  On September 17, 2021, while in the A-6 vestibule area, Jones "was held face-down, with a knee in [his] back by Sgt. S. Allen in full restraints, legs held in place by Officer E. Collins.  Officers J.A. Phipps, N.Z. Perrigan, [and] P. Sayer . . . took turns punching [Jones] in the face while [he] was fully restrained and immobilized."[1]  Compl. 2, 3, ECF No. 1.  Defendant Mickles (referred to in some submissions as Mickels) "kicked [Jones] in the face shattering [his] nose upon impact," "put his foot on [Jones's] neck pressing down with his body-weight," and

---

[1]  I have omitted internal quotation marks, alterations, and/or citations here and throughout this Opinion, unless otherwise noted.

then "repeated the same choking-man[e]uver with his knee." *Id.* at 3.   Collins released his hold on Jones' legs to "allow a service dog to bite [Jones] on the calf and behind the thigh." *Id.*

After this altercation, officers placed Jones into a wheelchair and transported him to the Red Onion "triage." *Id.* at 2.   Jones' face was "swollen," and he was bleeding "profusely from the nose." *Id.* at 4.   Staff removed his bloody clothing as "hazardous waste." *Id.*   Nurse Trent examined Jones, who said that he "had been attacked by officers and knew for certain [his] nose was shattered" from being kicked in the face. *Id.*   Trent noted observing no serious injury after performing a "full facial assessment." *Id.*   In medical notes about a later second examination, Trent wrote that Jones "reported no medical complaints." *Id.*

The medical staff placed Jones in a medical housing cell a few doors down from the exam room.   When NP Jessee performed rounds in the medical unit, Jones told her about his injuries.   Jessee said, "I don't give a fu## (expletive), it was your own fault." *Id.* at 5.   Jessee did not examine or treat Jones for his medical needs.

Jones contacted his family, complaining that he had not received medical care after the encounter with the officers on September 17, 2021.   Two or three weeks after that incident, a VDOC investigative agent met with Jones to hear his complaints.   Thereafter, the VDOC regional physician, Dr. Fox, examined Jones and confirmed that Jones' "nose was not only broken but communaly [sic] fractured and

[he] would have to see a specialist." *Id.* at 6.  A couple of weeks later, Jones was assessed by Dr. Matthew Hubbard, "a practicing out-patient E.N.T. service provider." *Id.*  Dr. Hubbard "concluded that [Jones] had several issues related to [his] nose.  To such a severity [he] would likely require surgery." *Id.* at 7.

Jones sues Salyers, Collins, Phipps, Perrigan, Allen, and Mickles for use of excessive force, and he sues Trent and Jessee (the medical defendants) for denying him appropriate medical care, all in violation of his constitutional rights.  As relief in this case, Jones seeks monetary damages and an order directing plastic surgery for his nose.  I will separately address the medical claims and the excessive force claims.

## II.  MEDICAL CLAIMS.

### A.  The Summary Judgment Standard.

Under Rule 56 of the Federal Rules of Civil Procedure, the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  When ruling on a motion for summary judgment, "[t]he Court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party." *Shaw v. Foreman*, 59 F.4th 121, 129 (4th Cir. 2023).  The court "may not weigh the evidence or make credibility determinations." *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019).

A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To avoid summary judgment, a party must "must set forth specific facts showing that there is a genuine [factual] issue for trial" on which the jury could find in his or her favor.  *Id.*  Thus, the court's summary judgment inquiry is whether the evidence, taken in the light most favorable to the nonmoving party, "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014).  A pro se litigant's verified complaint must be considered as an affidavit and may defeat a motion for summary judgment "when the allegations contained therein are based on personal knowledge."  *Goodman v. Diggs*, 986 F.3d 493, 498 (4th Cir. 2021).

## B.   *Deliberate Indifference Standard.*

To state a claim under § 1983, a plaintiff must allege "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).  A prison official's "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429

U.S. 97, 104 (1976). "A deliberate indifference claim consists of two components, objective and subjective." *Jackson*, 775 F.3d at 178.

First, the plaintiff must prove that, objectively, his medical condition was sufficiently "serious." *Id.* For purposes of a constitutional claim, a condition that qualifies as objectively serious is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).

Second, the plaintiff must prove that, subjectively, the defendant was deliberately indifferent to the plaintiff's serious medical need. An official is deliberately indifferent only when he or she "knows of and disregards an excessive risk to inmate health or safety. . . . That is a higher standard for culpability than mere negligence," such that "many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "[I]t is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Id.* Put another way, the defendant must have known the plaintiff was suffering from a condition which posed a risk to the prisoner such that it "would result in further significant injury or unnecessary and wanton infliction of

pain if not treated." *Formica v. Aylor*, 739 F. App'x 745, 755 (4th Cir. 2018) (unpublished).   Furthermore, to be unconstitutional, a defendant's conduct must have been "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990), *overruled in part on other grounds by Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

### C.   Medical Defendants' Evidence.

After the altercation on September 17, 2021, officers brought Jones to the Red Onion infirmary, where Trent assessed and recorded written notes about the inmate's physical condition and medical needs, as reflected in submitted medical records. Trent saw that Jones' nose was bleeding and swollen and that he had a contusion over his lift eyebrow.   Trent cleaned the blood from Jones' face and saw no continued bleeding from his nose.   Evaluating Jones further, Trent noted a two-to-three-millimeter in length laceration on the left shin and a one-to-two-millimeter in length laceration on the inner thigh. Trent observed no swelling or bleeding with these injuries.   Trent removed Jones's bloody clothing to assess him for any further injuries and did not find any.

Trent then assessed Jones' overall condition in light of the noted injuries. Trent reported that Jones was alert and oriented, his pupils were equal, round, and reactive to light, he was able to open his mouth, raise his eyebrows, smile, stick out

his tongue, and follow all facial commands without any apparent difficulty or reports of pain.  His oxygen saturation was 100% on room air, with no indications of difficulty in breathing.  Trent observed no signs of altered mental status, internal head injury, or eye injuries.  Jones could stand without difficulty and ambulate at a steady gait.  Trent noted that Jones was stable, cleaned both lacerations with soap and water, and then applied betadine and band-aids.

Trent also contacted NP Jessee who served as the prison's primary care provider and was not in the building that day.  Based on Trent's report on the evaluation of Jones, Jessee ordered an antibiotic, pain medication, and a tetanus/diphtheria shot, which Trent provided to Jones.  In addition, they kept Jones in the infirmary for further observation.

Trent reports not knowing for certain whether Jones had suffered a broken nose, but states "it was not necessary to resolve that issue," since the care provided would not have changed.  Med. Defs. Mem. Supp. Mot. Summ. J. Ex. A, Trent Aff. ¶ 10, ECF No. 66-1.  Jones' nose was not bleeding, he had no apparent difficulty breathing and reported none, and staff provided him with pain medication.  Also, in the infirmary, Jones was less likely to further injure his nose.  From information Trent related to Jessee, the nurse practitioner found no indication that Jones had a serious medical condition requiring different treatment than what the staff was providing to him.  Jessee states, "[e]xcept in very rare instances, not present in Mr.

Jones'[s] case, most nasal fractures are not treated at all." *Id.* at Ex. B, Jessee Aff. ¶ 7, ECF No. 66-2. Nothing in the reports Jessee received about Jones' injuries suggested that his condition "required an immediate visit to the emergency room and/or [for him] to be seen immediately by [her] or by a physician." *Id.*

On September 20, 2021, Jones called out to NP Jessee while she was doing her rounds in the infirmary and demanded to be seen. Jessee "did not observe anything about him which suggested he was in distress and/or otherwise needed immediate care and/or attention." *Id.* ¶ 9. So, she advised him to file a request to be seen at sick call. Jessee had no other involvement in Jones' medical care.

Jones did not file a sick call request. Instead, he filed some request and complaint forms with prison officials that were forwarded after a time to medical staff, who scheduled Jones for sick call on September 24, 2021.

Medical records indicate that on September 23 and 24, 2021, other providers assessed Jones after he announced that he was staging a hunger strike. Medical records by those providers indicate that Jones voiced no medical complaints and was alert and oriented, with even and unlabored breathing, his oxygen saturation was 100 percent on room air, and his vital signs were within normal limits. Trent Aff. ¶¶ 14–15, ECF No. 66-1.

Nurse Trent reviewed other providers' notes before examining Jones on September 24, 2021, at sick call. From his own assessment, Trent recorded that

Jones' oxygen saturation was 99% on room air, and his vital signs were within normal limits. Trent's exam indicated that Jones was alert and oriented to time, place, and person, and answered questions appropriately, communicating verbally and following simple commands without difficulty. Jones also ambulated to his cell door at a steady gait, offering no objective signs of pain. Trent noted that Jones denied having any pain or shortness of breath. The prescription for pain medication from September 17, 2021, was expiring, so Trent offered Jones a renewed prescription. Jones refused. From this exam, Trent noted "observ[ing] no serious injuries/conditions" and no indication from Jones that he had medical issues requiring attention. *Id.* at ¶ 17. Trent determined that Jones' condition did not indicate a need for different treatment. Jones remained in the infirmary, however, because of his hunger strike.

On September 25, 2021, a medical provider evaluated Jones because of the hunger strike. The provider's notes indicate that Jones' oxygen saturation level was 100 percent; his respirations were within normal limits, even and unlabored; his other vitals were within normal limits; he denied pain; and he was alert and oriented and in no apparent distress. Med. Defs. Mem. Supp. Mot. Summ. J. Ex. C, Medical Records, ECF No. 66-3. A provider who evaluated Jones on September 26, 2021, because of his hunger strike also noted that his respirations were even and unlabored. *Id.* Notes later that day indicate that Jones reported feeling better after eating three

meals.  On September 27, 2021, a provider noted that Jones was medically stable and alert and oriented.  *Id.*

The Health Authority at Red Onion referred Jones for evaluation by the VDOC regional medical director, Dr. Kevin Fox, during his next scheduled visit to Red Onion.  On October 8, 2021, Dr. Fox examined Jones for his complaints of possible nasal fracture and difficulty breathing through his nose related to the incident on September 17, 2021.  Jones asked Dr. Fox to refer him to a hospital emergency department.  Dr. Fox determined that Jones had suffered a nasal fracture. The doctor explained to Jones that except in very rare circumstances not present in his case, a broken nose does not require emergency room care and that most nasal fractures are not treated at all.

Dr. Fox did not note that Jones reported pain, he did not prescribe pain medication, and he did not order any emergency evaluation or other treatment for Jones' symptoms.  Rather, because Jones also complained of difficulty breathing, Dr. Fox "made a non-urgent referral" for Jones to be evaluated by an otolaryngologist (ENT).  *Id*. at Ex. D, Fox Aff. ¶ 5, ECF No. 66-4.

On November 22, 2021, ENT Dr. Matthew Hubbard examined Jones.  He prescribed a nonsurgical approach to Jones' complaints — a daily dose of Flonase steroid spray in each nostril and a saline spray in each nostril, twice daily, for six weeks.  Dr. Fox reviewed and implemented Dr. Hubbard's recommendations.  Jones

continued to complain of difficulty breathing, so Dr. Hubbard referred him for non-urgent nasal surgery.

Dr. Fox has reviewed the care that Trent and Jessee provided to Jones in the days right after the altercation on September 17, 2021. He states that the care Trent provided to Jones that day was appropriate care to address Jones' complaints. Dr. Fox reports finding no basis at that time for Trent to refer Jones to the nurse practitioner or the doctor for an immediate evaluation of Jones' condition, or for Trent or Jessee to have Jones transported to a hospital emergency department to seek a more immediate or urgent assessment of his nasal injury by a physician.

### D. Analysis.

Jones does not claim, nor could he, that Trent or Jessee ignored all of his medical needs after the altercation on September 17, 2021. Trent evaluated and documented his condition, cleaned, and bandaged the lacerations on his leg, and contacted Jessee to report the findings from the exam. Jessee ordered pain medication, an antibiotic, and a tetanus/diphtheria shot, and they kept Jones in the infirmary for observation and safety. The sole claim Jones brings against these defendants is that they did not properly address his broken nose. This claim fails under both prongs of the deliberate indifference standard.

First, because a broken nose often heals without medical intervention, Jones does not prove that his injury qualified as an objectively serious medical need.

Indeed, courts have held that a broken nose is not a sufficiently serious injury under the deliberate indifference standard. *Villalobos v. W. Reg'l Jail*, No. 3:18-01385, 2019 WL 2574202, at *7 (S.D.W. Va. May 24, 2019), *R. & R. adopted* 2019 WL 2579153 (S.D.W. Va. June 21, 2019). Jones does not demonstrate that his symptoms alone on September 17, 2021, were so obvious that even a lay person would have known his nose was broken. It was swollen and had bled, but Trent measured Jones' oxygen saturation that day at 100 percent on room air and noted no indications that Jones was having difficulty breathing. Dr. Fox, who examined Jones' nose three weeks after the altercation, states that had Trent or Jessee contacted him with a report of these symptoms, he would not have directed that they obtain urgent or emergency treatment for Jones based on a possible nasal fracture. Other providers who assessed Jones during his hunger strike reached similar findings and did not perceive him to be in distress or having breathing issues. Dr. Hubbard, the ENT physician who later evaluated Jones, did not find a need for immediate surgery to address the fracture. He prescribed nasal sprays for six weeks and then reevaluated Jones' condition for possible surgery. In short, even assuming a broken nose might qualify as a serious medical need under some circumstances, the evidence does not show that the nasal fracture Jones suffered on September 17, 2021, met that standard.

Second, Jones fails to present any material disputed fact on which he could show that Trent or Jessee acted with deliberate indifference. He simply has not

reported any symptom related to his broken nose on which he could prove that Trent or Jessee subjectively knew this injury posed an excessive risk to Jones if they did nothing further to address it. *Jackson*, 775 F.3d at 178.  The summarized facts above about Jones' condition on the day of the injury and thereafter do not provide evidence that his nose urgently required different treatment than Trent and Jessee provided.  On the day of the altercation, Trent did not observe Jones having any breathing difficulty and tested his oxygen saturation level at 100%.  Given the symptoms Jones presented to Trent and Jessee, Dr. Fox said he would not have prescribed different care than they provided to Jones, such as immediate examination by a physician or a trip to a hospital emergency room.  Jessee did not see any physical signs that Jones was in medical distress when he called out to her during her rounds on September 20, 2021.  Even if Trent and Jessee knew or suspected that Jones had a broken nose, Jones has not demonstrated that they knew of a serious medical reason to provide different care for that condition.

Under certain circumstances, a delay in medical treatment may be sufficient to state a claim for deliberate indifference, but only "if the delay results in some substantial harm to the patient." *Webb v. Hamidullah*, 281 F. App'x 159, 166 (4th Cir. 2008) (unpublished).  Where a deliberate indifference claim is predicated on delay in medical care, the plaintiff must show that the delay itself resulted "in some substantial harm to the patient, such as a marked exacerbation of the prisoner's

medical condition or frequent complaints of severe pain. *Formica*, 739 F. App'x at 755.

Liberally construing Jones' submissions, he contends that because Trent and Jessee knew on September 17, 2021, that his nose might be broken, they should have referred him immediately for further care, and their failure to do so delayed Jones from receiving proper care for that injury. Jones has presented no evidence that this alleged delay in appropriate care caused him any substantial harm, however. The defendants provided pain medication the day of the injury. In subsequent days and weeks, Jones did not report pain to any of the providers who assessed him. Objective findings by multiple providers indicated oxygen saturation at normal levels. And when Dr. Fox and Dr. Hubbard evaluated Jones, they did not find any medical need for urgent treatment. The specialist prescribed conservative treatment for six weeks before even considering a surgical option. This record does not support a finding that Trent or Jessee caused Jones substantial harm by not sending him immediately to a doctor for his nose injury.

Jones has raised some disputes with the medical defendants' evidence. He claims Trent lied in medical notes by writing that he observed no serious injury on September 17, 2021. He complains that on September 24, 2021, Trent noted that Jones reported no medical complaints during the exam, even though the exam was scheduled in response to Jones' written complaints that his nose was broken and was

healing incorrectly.  He faults Trent for writing that no referral to see a doctor was necessary.  Jones questions how Dr. Fox could decide weeks later that the treatment decisions Trent and Jessee made on the day of the injury were appropriate ones.  These disputes, with Trent's notes and providers' medical decisions, are mere disagreements with medical judgments.  Such disagreements do not support the finding of deliberate indifference necessary for a constitutional claim.  *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975).

For the stated reasons, I cannot find that Jones presents material disputes of fact on which he could prove his claim that Trent and Jessee were deliberately indifferent to any serious medical need he suffered during the September 17, 2021, altercation with officers.  Therefore, I will grant summary judgment to defendants Trent and Jessee, and I will deny Jones' summary judgment motion as to his claims against these defendants.

### III.   EXCESSIVE FORCE CLAIMS.

Jones contends that his evidence, including video footage of the altercation with officers, provides grounds for summary judgment in his favor on the excessive force claims.  Based on evidence in the record, I cannot find that Jones is entitled to summary judgment as a matter of law.

*A. Constitutional Standard.*

An Eighth Amendment claim of excessive force involves both an objective and a subjective component. *Brooks v. Johnson*, 924 F.3d 104, 112 (4th Cir. 2019). In assessing the objective component, the court must ask whether the nature of the force used was objectively "harmful enough" to establish a constitutional violation. *Wilson v. Seiter*, 501 US 294, 303 (1991). "This is not a high bar; de minimis or trivial force is not enough, but anything more will suffice." *Dean v. Jones*, 984 F.3d 295, 302 (4th Cir. 2021). The extent of the resulting injury is one factor to consider in determining the amount of force applied and whether it was plausibly considered necessary. *Wilkins v. Gaddy*, 559 U.S. 34, 36 (2010).

The subjective component requires a plaintiff to establish that a correctional officer "acted with a sufficiently culpable state of mind." *Williams v. Benjamin*, 77 F.3d 756, 761 (4th Cir. 1996)). "In contrast to the objective component, this is a demanding standard; the state of mind required . . . is wantonness in the infliction of pain." *Brooks*, 924 F.3d at 112. The inmate must establish that force was applied "maliciously and sadistically for the very purpose of causing harm," rather than "in a good faith effort to maintain or restore discipline." *Dean*, 984 F.3d at 302. To assess an officer's state of mind, I must consider four non-exclusive factors: "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of any reasonably perceived threat that

the application of force was intended to quell; and (4) any efforts made to temper the severity of a forceful response." *Iko*, 535 F.3d at 239.

### B.   Use of Force Evidence.

In brief, Jones alleges that on September 17, 2021, in the A-b vestibule at Red Onion at about 2:08 p.m., while he was in full restraints, defendants Collins, Phipps, Perrigan, and Salyers held him face down on the ground and punched him in the face.  Compl. 3, ECF No. 1.  He claims defendant Mickles kicked him in the face and placed his foot and then his knee on Jones' neck.  Collins allegedly released his hold on Jones' legs to permit a K-9 to bite the inmate.

Other evidence in the record provides a different context for the officers' actions that day.  Defendant Perrigan states that on September 17, 2021, he, Phipps, and Sergeant Allen took Jones to the vestibule area to discuss his complaint about his lunch tray.  Jones had his arms crossed in front, so Perrigan ordered him to place his arms at his side to be sure that he was not hiding something.  Jones did not comply.  Jones then "became verbally disruptive, stating, 'Fuck you, it's about to get real in here.'"  Opp'n Mot. Summ. J. Gilbert Aff. ¶ 4, ECF No. 68-1.  Because of Jones' agitation, Allen ordered him to present himself to be cuffed for staff safety. Perrigan put a handcuff on one of Jones' hands, but as he tried to pull the inmate's other hand toward the cuffed hand to restrain it, Jones "pulled away and began fighting with staff."  *Id.* at Perrigan Aff. ¶ 4, ECF No. 68-2.  The officers placed

Jones against the wall, giving him orders to stop resisting.   Jones "became combative" and tried to bite Perrigan.   *Id.* The officers placed Jones on the floor, trying to gain control over him.   "Phipps used an approved striking technique to Jones' face as he was attempting to bite and assault staff."   *Id.* ¶ 5.   Perrigan was near Jones' head when the inmate grabbed his hand, and the officer was injured when his hand got caught inside the handcuffs.

The record also includes incident reports about the September 17, 2021, incident, summarized in an affidavit from Captain C. Gilbert.   When the altercation with Jones began, Allen called by radio for K-9 assistance, and other officers, including Gilbert, reported to assist.   Three K-9 officers reported to the area, but they did not order their dogs to engage.   As K-9 Officer McReynolds began to exit the vestibule area with his assigned K-9 Oscar, the dog slipped out of his collar and ran toward the group around Jones.   Oscar "made contact with Officer J. Dotson's right leg before moving to make contact with inmate Jones'[s] left leg.   K-9 Officer McReynolds reacted immediately moving in taking control of K-9 Oscar before he could engage anyone."   Gilbert Aff. ¶ 7, ECF No. 68-1.   Officers Phipps, Perrigan, and Dotson were checked in the medical unit for injuries they received during the incident.

### C.   *Analysis*.

Jones has evidence in support of the objective facet of the standard.  It is undisputed that he suffered puncture wounds to his leg and a broken nose.  The evidence also indicates that officers used physical force to place Jones against a wall and take him to the floor, and that they applied strike techniques to his face in trying to bring him under control and restrain him.  Thus, the evidence shows, objectively, that the incident involved the use of more than trivial force.

I conclude, however, that taken in the light most favorable to the correctional officers as the nonmovants here, the evidence in the record reflects material disputes of fact on the subjective facet of the Eighth Amendment standard.  Sworn affidavits state that officers used force against Jones only in response to his threatening statements, his display of agitation, his failure to comply with orders to be handcuffed, his pulling away from the officers, and his repeated attempts to hit or bite officers as he resisted the officers' efforts to gain control over him and apply restraints.  From the officers' perspectives, Jones presented a need for some force (handcuffs) when he became agitated.  The officers began with verbal orders to comply with cuffing procedures as an effort to temper the amount of force.  The threat Jones posed, the need for force, and the amount of force necessary to address Jones' increasingly disruptive conduct became greater when he failed to comply with orders, physically fought against their efforts to apply cuffs, and tried actively

to assault them.  Under the applicable legal standard, a fact finder could determine that the officers' uses of force represented their good faith effort to restore order and discipline.  *Iko*, 535 F.3d at 239.

Where the version of events by one party or a group of parties is so utterly discredited by unchallenged video footage that no reasonable jury could believe that version of events, summary judgment is appropriate.  *Scott v. Harris*, 550 U.S. 372, 380-381 (2007).

Two video clips show the interaction between Jones and the three officers in the entryway part of the vestibule area on September 17, 2021:

> 210917141325_ROSP174HUA400-600VESTIBULE,[2] and
> 210917141324_ROSP175HUA400-600SHACKDOWN.

ECF No. 78.  Both video clips show Jones and the officers walking into an entryway area around 2:07 p.m.  Jones is not in handcuffs or shackles, and the four of them stand for several seconds, apparently talking.  The "SHACKDOWN" video clip shows that a little after 2:08 p.m., the officer on the right reaches for something at his waist, and all officers move toward Jones.  The camera's view of Jones himself is blocked by a metal detector.  Within seconds, the officers and Jones are struggling with each other.  One cannot clearly discern Jones' actions, but he appears to be

---

[2] This camera view shows Jones and three officers walking across the vestibule and then through a door into an outer entryway.  After the door closes, their actions (including the altercation) are only partially visible through the window in the door.  Thus, this video footage provides few helpful details about individual action during the altercation.

trying to pull away from the officers.  The group moves together to the right wall and then to the floor, with two officers on top of Jones.  The third officer grabs Jones' ankles and drags him away from the wall.  The officers appear to be struggling with or against Jones, who is face down, but the participants' specific actions are blocked from the camera's view by the officers' bodies and the metal detector.  The third officer joins the others on the ground beside Jones.  Jones' feet and unshackled ankles are visible as the officers are hunched over his upper body.

Shortly after 2:09 p.m., a K-9 officer and his dog and then multiple other officers arrive through an outside door to the left of the screen.  Some of the officers join the group hovering over Jones, and others stand ready to help.  Together, they effectively block the camera's view of any particular actions by any individual, including Jones.  A K-9 officer and his dog remain against the left wall of the entry way during this turmoil.  At about 2:11:40 p.m., this K-9 officer appears to be heading for the outside door when the dog slips out of his collar and runs toward the group of officers around Jones.  Officers scatter in all directions.  The K-9 officer immediately dashes after the dog.  The dog's specific actions against Jones are blocked from the camera's view.  Around 2:11:55 p.m., the K-9 officer gets his dog under control and exits the area.  At about 2:12:45 p.m., an officer brings in a wheelchair.  Officers then lift Jones into the chair and wheel him outside.  Other videos show him being wheeled without incident to the medical unit.

From the unchallenged video footage and the defendants' other evidence in the record, I cannot conclude as Jones argues that no reasonable jury could believe the officers' use of force on September 17, 2021, was reasonable under the circumstances. The video footage showing the interactions between Jones and the defendant officers does not contradict the defendants' affidavits and the incident reports about Jones' actions that triggered uses of force to regain control of him after he tried to assault officers. *Iko*, 535 F.3d at 239. Moreover, the video footage does not show any officer purposely allowing a dog to bite Jones. Rather, any interactions the dog had with Jones appear to have been entirely accidental, after the animal unexpectedly slipped out of his collar.

For the reasons stated, I conclude that Jones fails to establish he is entitled to summary judgment as a matter of law against any defendant. Because a trial is thus required to resolve these issues, I will deny Jones' summary judgment motion as to the claims of excessive force.

## IV.  CONCLUSION.

In accordance with the foregoing, it is **ORDERED** as follows:

1. The Clerk will amend the docket to indicate the correct spelling of the last names of Jessee and Salyers;

2. Defendants NP Jessee and RN Trent's Motion for Summary Judgment, ECF No. 65, is GRANTED and the Clerk shall terminate those defendants as parties;

3. The plaintiff's Motion for Summary Judgment, ECF No. 58, is DENIED; and

4. The Clerk shall schedule a jury trial in the Abingdon Courthouse on the claims of excessive force against Defendants Perrigan, Salyers, Collins, Allen, and Phipps, at the court's earliest convenience.

ENTER:   September 29, 2023

/s/  JAMES P. JONES
Senior United States District Judge